1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT
9                        CENTRAL DISTRICT OF CALIFORNIA
10

11   K.E.B.,                              Case No. 2:19-cv-09501-SHK

12                       Plaintiff,

13              v.                        OPINION AND ORDER

14   ANDREW M. SAUL, Commissioner of
     Social Security,
15
                         Defendant.
16

17

18          Plaintiff K.E.B.[1] ("Plaintiff") seeks judicial review of the final decision of the

19   Commissioner of the Social Security Administration ("Commissioner,"

20   "Agency," or "Defendant") denying her application for disability insurance

21   benefits ("DIB"), under Title II of the Social Security Act (the "Act").  This

22   Court has jurisdiction under 42 U.S.C. § 405(g), and, pursuant to 28 U.S.C.

23   § 636(c), the parties have consented to the jurisdiction of the undersigned United

24   States Magistrate Judge.  For the reasons stated below, the Commissioner's

25   decision is REVERSED and this action is REMANDED for further proceedings

26   consistent with this Order.

27   _____

28   [1] The Court substitutes Plaintiff's initials for Plaintiff's name to protect Plaintiff's privacy with
     respect to Plaintiff's medical records discussed in this Opinion and Order.

# I.    BACKGROUND

Plaintiff filed an application for DIB on June 29, 2016, alleging disability beginning on June 7, 2016.  Transcript ("Tr.") 162-63.[2]  Plaintiff amended the alleged disability onset date to October 28, 2014.  Tr. 15.  Following a denial of benefits, Plaintiff requested a hearing before an administrative law judge ("ALJ") and, on November 8, 2018, ALJ Mary Everstine determined that Plaintiff was not disabled.  Tr. 12-29.  Plaintiff sought review of the ALJ's decision with the Appeals Council, however, review was denied on September 18, 2019.  Tr. 1-6.  This appeal followed.

# II.    STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on correct legal standards and the legal findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); Batson v. Comm'r Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and internal quotation marks omitted).  In reviewing the Commissioner's alleged errors, this Court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusions."  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).

"'When evidence reasonably supports either confirming or reversing the ALJ's decision, [the Court] may not substitute [its] judgment for that of the ALJ.'"  Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting Batson, 359 F.3d at 1196); see also Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) ("If the ALJ's credibility finding is supported by substantial evidence in the record, [the

---

[2] A certified copy of the Administrative Record was filed on March 31, 2020.  Electronic Case Filing Number ("ECF No.") 16.  Citations will be made to the Administrative Record or Transcript page number rather than the ECF page number.

Court] may not engage in second-guessing.") (citation omitted).  A reviewing court, however, "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision."  Stout v. Comm'r Soc. Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006) (citation omitted).  Finally, a court may not reverse an ALJ's decision if the error is harmless.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409 (2009).

## III.   DISCUSSION

### A.   Establishing Disability Under The Act

To establish whether a claimant is disabled under the Act, it must be shown that:

> (a) the claimant suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months; and
>
> (b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).  "If a claimant meets both requirements, he or she is 'disabled.'" Id.

The ALJ employs a five-step sequential evaluation process to determine whether a claimant is disabled within the meaning of the Act.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520(a).  Each step is potentially dispositive and "if a claimant is found to be 'disabled' or 'not-disabled' at any step in the sequence, there is no need to consider subsequent steps."  Tackett, 180 F.3d

3

1   at 1098; 20 C.F.R. § 404.1520.  The claimant carries the burden of proof at steps
2   one through four, and the Commissioner carries the burden of proof at step five.
3   Tackett, 180 F.3d at 1098.

4       The five steps are:

5           Step 1.  Is the claimant presently working in a substantially gainful
6       activity [("SGA")]?  If so, then the claimant is "not disabled" within
7       the meaning of the [] Act and is not entitled to [DIB].  If the claimant is
8       not working in a [SGA], then the claimant's case cannot be resolved at
9       step one and the evaluation proceeds to step two.  See 20 C.F.R.
10      § 404.1520(b).

11          Step 2.  Is the claimant's impairment severe?  If not, then the
12      claimant is "not disabled" and is not entitled to [DIB].  If the claimant's
13      impairment is severe, then the claimant's case cannot be resolved at
14      step two and the evaluation proceeds to step three.  See 20 C.F.R.
15      § 404.1520(c).

16          Step 3.  Does the impairment "meet or equal" one of a list of
17      specific impairments described in the regulations?  If so, the claimant is
18      "disabled"  and  therefore  entitled  to  [DIB].   If  the  claimant's
19      impairment neither meets nor equals one of the impairments listed in
20      the regulations, then the claimant's case cannot be resolved at step
21      three  and  the  evaluation  proceeds  to  step  four.   See 20 C.F.R.
22      § 404.1520(d).

23          Step 4.  Is the claimant able to do any work that he or she has
24      done in the past?  If so, then the claimant is "not disabled" and is not
25      entitled to [DIB].  If the claimant cannot do any work he or she did in
26      the past, then the claimant's case cannot be resolved at step four and
27      the evaluation proceeds to the fifth and final step.  See 20 C.F.R.
28      § 404.1520(e).

4

Step 5.  Is the claimant able to do any other work?  If not, then the claimant is "disabled" and therefore entitled to [DIB].  See 20 C.F.R. § 404.1520(f)(1).  If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do.  There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert [("VE")], or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2.  If the Commissioner meets this burden, the claimant is "not disabled" and therefore not entitled to [DIB].  See 20 C.F.R. §§ 404.1520(f), 404.1562.  If the Commissioner cannot meet this burden, then the claimant is "disabled" and therefore entitled to [DIB].  See id.

Id. at 1098-99.

**B.** **Summary Of ALJ's Findings**

The ALJ determined that "[Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2020." Tr. 17.  The ALJ then found at step one, that "[Plaintiff] has not engaged in [SGA] since October 28, 2014, the alleged onset date (20 CFR 404.1571 et seq.)."  Id.  At step two, the ALJ found that "[Plaintiff] has the following severe impairments: multi-level degenerative disc disease of the lumbar spine with mild to moderate stenosis, poly-radiculopathy and L5-S 1 grade I anterolisthesis due to pars defect and disc bulge with moderate to severe foraminal stenosis; history of tachycardia (asymptomatic with medication); left elbow epicondylitis with small bone fragment suggestive of old nonunion fracture; C4-5 and C5- 6 foraminal stenosis; mild osteoarthritis of left knee with chondromalacia; status post left foot bunionectomy and hammertoe repair times 3 (March 2016); status post left foot hammertoe repair (September 2016); and carotid artery stenosis (20 CFR 404.1520(c))."  Tr. 18.  At step three, the ALJ

5

found that "[Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." Id.

In preparation for step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to:

> perform sedentary work as defined in 20 CFR 404.1567(a) except no more than occasional overhead reaching bilaterally; no more than frequent gross handling with the left upper extremity but no left upper extremity limitations in fine fingering or feeling, and no limitations with the right upper extremity.

Tr. 18-19. The ALJ then found, at step four, that "[Plaintiff] is capable of performing past relevant work as a bookkeeper. This work does not require the performance of work-related activities precluded by [Plaintiff]'s [RFC] (20 CFR 404.1565)." Tr. 24.

The ALJ, therefore, found that "[Plaintiff] has not been under a disability, as defined in the . . . Act, from October 28, 2014, through [November 8, 2018,] the date of th[e] decision (20 CFR 404.1520(f))." Id.

**C.  Issues Presented**

In this appeal, Plaintiff raises three issues, whether the ALJ erred by: (1) failing to "make any finding concerning additional sitting limitations despite overwhelming evidence of issues in this regard which would prevent full time employment"; (2) failing to "make any finding concerning additional findings concerning Plaintiff's necessity to elevate her feet and the amount of time she would be off task"; and (3) "finding that Plaintiff could perform past-relevant work as a bookkeeper despite the factual support that the only way she performed this work was due to the fact that she was self-employed." ECF No. 18, Joint Stip. at 3-4.

6

1    **D.    Court's Consideration Of The Issues Raised**

2        **1.    Parties' Arguments**

3        As an initial matter, the Court notes that although Plaintiff raised three

4    distinct issues, Plaintiff did not address each issue individually.  See id. at 4-5.

5    Instead, Plaintiff supports the aforementioned arguments by asserting briefly that

6    the ALJ erred by failing to include all her functional limitations in her RFC by: (1)

7    improperly rejecting the opinions of three of Plaintiff's treating doctors "despite

8    their consistency with the overall record as well as Plaintiff's testimony"; (2)

9    finding Plaintiff's "testimony not consistent with the records that [the ALJ] wants

10   to follow"; and (3) failing to consider that "[s]ince [Plaintiff] was self-employed,

11   she could work at her own schedule and pace" and that jobs that accommodate

12   Plaintiff's limitations in the way her self-employment did "simply do not exist in

13   this fashion in the open labor market."  Id. at 4-5, 10.

14       Defendant responds that "[t]he ALJ's RFC finding was duly supported by

15   substantial evidence as she duly assessed the medical and other record evidence

16   including Plaintiff's own allegations."  Id. at 6.  Defendant asserts that the ALJ

17   "properly resolved the medical opinions" in the record, correctly found that

18   Plaintiff's symptom statements were "undermined by inconsistencies in the

19   record[,]" and "properly rejected" Plaintiff's "alleged accommodation[s] of her

20   'disabilities'" in her PRW because Plaintiff's need for the alleged accommodations

21   was "unsupported by the record."  Id. at 6-9.  Defendant adds that to the extent

22   Plaintiff failed to specifically dispute the reasons provided by the ALJ for rejecting

23   Plaintiff's symptom statements, "Plaintiff ignored those findings and may no

24   longer dispute them."  Id. at 6-7.

25       Although Plaintiff did not specifically address some of the evidence

26   discussed below, the Court has weighed "both the evidence that supports and

27   detracts from the [ALJ's] conclusions[,]" Martinez, 807 F.2d at 772, and finds that

28   the ALJ's rejection of Plaintiff's symptom statements was not supported by

substantial evidence in the record.  Consequently, the ALJ's RFC determination and step-four findings was not supported by substantial evidence in the record. The Court addresses this conclusion below.

> ### 2.    ALJ's Consideration Of Plaintiff's Symptom Statements

The ALJ began her assessment of Plaintiff's symptom statements by discussing Plaintiff's testimony from the administrative hearing.  Tr. 19. Specifically, the ALJ observed that:

> At the hearing, [Plaintiff] testified that she is disabled due to constant pain from 'head to toe.'  She has had a brain lesion since 3rd grade that causes seizure-like activity . . . about once a month that causes her to drop to the floor.  [Plaintiff] testified she has pinched nerves in her back and neck.  She has nerve damage in her wrists[,] and she underwent 4 surgeries on each foot[,] most recently left foot surgery in March 2018 for which she still wears a brace.  [Plaintiff] testified she has arthritis in her knees and that her pain is at level 8 on a 0-10 pain scale.  She only takes Advil during the day and uses a lidocaine patch at night so she is able to sleep.  She uses ice and heat and sits and rests as needed throughout the day.  [Plaintiff] produced a suitcase full of various braces and testified she has worn wrist braces since age 32.  She demonstrated her use of the wrist braces by slipping them onto her hands.  To a layperson, the braces appeared loose contrary to the typical method of wrapping the Velcro straps after the brace is put on rather than merely slipping them on.

Tr. 19.

> The ALJ added that:

> [Plaintiff] lives with her retired husband who has health problems.  She is able to drive a car and she can walk for 30 minutes with a boot and then she must elevate her foot.  [Plaintiff] testified she can stand only

15 minutes due to her vasovagal syndrome, sit 1 hour at a time, and she avoids heavy lifting.  She testified she sits or lies down as needed throughout the day although she can perform cooking household chores, and shopping.  [Plaintiff] testified she continues to work, performing work for an hour and then taking a 2 hour break.

Id.

After discussing Plaintiff's symptom statements, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e] decision."  Tr. 20.

The ALJ explained that "[t]he record reflects at [Tr. 489, 494] that [Plaintiff] denied difficulty walking or climbing stairs, any difficulty dressing and bathing, and any difficulty independently performing/running errands."  Id.  The ALJ added that "[a]t [Tr. 667-72 [Plaintiff] reported she was able to perform [activities of daily living ("ADLs")] of driving a car, walking on a daily basis, and consistently performing part-time work as a self-employed bookkeeper" and that "[a]t the hearing, [Plaintiff] testified she can drive a car, walk 30 minutes, sit for 1 hour at a time, and she can cook, perform household chores, and go shopping."  Id. The ALJ found that "[w]hile not controlling, such activities are generally inconsistent with disability because they indicate sufficient capacity to perform focused and substantial activities similar to the capacity required to perform many job functions."  Id.

The ALJ next found that Plaintiff's "statements regarding the intensity, persistence, and limiting effects of [her] symptoms are undermined by inconsistencies in the record."  Id.  The ALJ noted, "[f]or example, while [Plaintiff] testified that she underwent 4 surgeries to each foot and recently

9

underwent left foot surgery in March 2018, she reported to the orthopedic [consultative examiner ("CE")] that she had undergone 5 surgeries to the right foot and 2 surgeries to the left foot." Id.  The ALJ added that "if her testimony were accurate, she would have undergone 2 more surgeries to the left foot between April 2017 and the hearings on September 2, 2018, and 1 less surgery to the right foot." Id.  The ALJ also noted that "[w]hile [Plaintiff] complained of significant knee pain to the orthopedic CE at [Tr. 667-72] [that] apparently caus[es] a limitation of no more than occasional climbing of stairs or steps, [Plaintiff] consistently denied difficulty walking or climbing stairs to the orthopedic surgeon, Dr. Ramberg at [Tr. 489, 494]." Id.  The ALJ also noted that "[w]hile [Plaintiff] is not currently engaged in substantial gainful activity, her regular and consistent part-time work activities over a protracted period of time are some evidence tending to show her ability to engage in [SGA]" and that "[s]uch inconsistencies in the record tend to diminish the veracity of [Plaintiff's] allegations." Id.

Next, the ALJ observed that "[i]n the present case, [Plaintiff] reported taking over-the-counter Advil during the day and then using a lidocaine patch at night, despite complaints of 'constant' widespread body pain from 'head to toe.'" Tr. 20-21.  The ALJ found that "[if] her pain were as severe as alleged, on would expect [Plaintiff] to take stronger prescribed pain medication instead of over-the-counter medication and a patch." Tr. 21.

The ALJ next found that "[t]he consistency of [Plaintiff's] allegations is further reduced by indications of noncompliance with medical evidence." Id.  The ALJ noted, "[f]or example, at [Tr. 257] [Plaintiff] refused to undergo lumbar surgery despite a diagnosis of severe lumbar stenosis, although she agreed reluctantly to consult with Dr. Ramberg." Id.  The ALJ added that Plaintiff "also refused surgery as to cervical stenosis and she was reluctant to accept her diagnosis." Id.  Next, the ALJ added that "[a]lthough [Plaintiff] was advised to undergo physical therapy . . . based on a history of improvement with physical

10

therapy, physical therapy progress notes at [Tr. 762-74] indicate no documented attendance in physical therapy after 2013." Id.  The ALJ added that Plaintiff "was advised to undergo further injections based on her history of improvement with injections [but] the record fails to reflect compliance or follow-up with this advice." Id.

Finally, the ALJ noted that "[t]reating sources have generally responded with limited and conservative treatment which [Plaintiff] apparently agreed with by failing to undergo surgery." Id.  The ALJ found that "such treatment is inconsistent with, and would not be expected from treating sources if they found the level of severity of symptoms as alleged by [Plaintiff]." Id.  The ALJ, therefore, found that "based on the totality of the record, . . . while partially consistent, [Plaintiff's] statements as to the intensity, persistence, and limiting effects of the symptoms are not consistent with the evidence to the extent of establishing disability." Id.

### 3. Standard To Review ALJ's Analysis Of Plaintiff's Symptom Statements

When a claimant has medically documented impairments that "might reasonably produce the symptoms or pain alleged and there is no evidence of malingering, the ALJ must give 'specific, clear, and convincing reasons for rejecting' the testimony by identifying 'which testimony [the ALJ] found not credible' and explaining 'which evidence contradicted that testimony.'" Laborin v. Berryhill, 867 F.3d 1151, 1155 (9th Cir. 2017) (emphasis in original) (quoting Brown-Hunter v. Colvin, 806 F.3d 487, 489, 494 (9th Cir. 2015).  "This is not an easy requirement to meet: 'the clear and convincing standard is the most demanding required in Social Security cases.'" Garrison v. Colvin, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting Moore v. Comm'r Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002)).

/ / /

11

1    "The ALJ may consider inconsistencies either in the claimant's testimony or

2    between the testimony and the claimant's conduct." Molina v. Astrue, 674 F.3d

3    1104, 1112 (9th Cir. 2012), superseded by regulation on other grounds. Also, while

4    an ALJ cannot reject the severity of subjective complaints solely on the lack of

5    objective evidence, the ALJ may nonetheless look to the medical record for

6    inconsistencies. See Morgan v. Comm'r Soc. Sec. Admin., 169 F.3d 595, 599-600

7    (9th Cir. 1999) (finding that "[t]he ALJ provided clear and convincing reasons for

8    rejecting [Plaintiff's] testimony" by "point[ing] to specific evidence in the

9    record—including reports by [Plaintiff's doctors]—in identifying what testimony

10   was not credible and what evidence undermined [Plaintiff's] complaints.").

11          **4.     ALJ's Decision Is Not Supported By Substantial Evidence**

12          Here, the ALJ rejected Plaintiff's symptom statements for the following five

13   reasons: (1) Plaintiff's ADLs were "generally inconsistent with disability"; (2)

14   "inconsistencies in the record" between Plaintiff's statements and the medical

15   evidence; (3) Plaintiff's failure "take stronger prescribed pain medication instead

16   of over-the-counter medication and a patch"; (4) Plaintiff's "noncompliance with

17   medical evidence"; and (5) "limited and conservative treatment." Tr. 19-21. The

18   Court addresses each in turn.

19                    *a.     Plaintiff's ADLs*

20          As discussed above, the ALJ noted that Plaintiff's ADL's included driving a

21   car, "cooking[,] household chores, and shopping[,]" and "perform[ing] part-time

22   work as a self-employed bookkeeper[.]" Tr. 19-20 (citing Tr. 489, 494). The ALJ

23   further noted that Plaintiff "denied difficulty walking or climbing stairs, any

24   difficulty dressing and bathing, and any difficulty independently

25   performing/running errands." Id. The ALJ found that "[w]hile not controlling,

26   such activities are generally inconsistent with disability because they indicate

27   sufficient capacity to perform focused and substantial activities similar to the

28   capacity required to perform many job functions." Id.

1    The ALJ's rejection of Plaintiff's symptom statements due to Plaintiff's

2    ADLs fails for three reasons.

3    First, the ALJ considered only some evidence in the record that supports her

4    rejection of Plaintiff's symptoms, while ignoring evidence in the record that

5    Plaintiff performed the ADLs cited by the ALJ with limitations.  See Holohan v.

6    Massanari, 246 F.3d 1195, 1207-08 (9th Cir. 2001) (holding that an ALJ cannot

7    selectively rely on some entries in plaintiff's records while ignoring others).

8    For example, the ALJ did not consider evidence that Plaintiff's ability to

9    cook and do household chores is limited.  Plaintiff testified that her husband is

10   "very sick" and disabled and that she "do[es] some of the household chores[]

11   [m]ainly because [her] husband isn't able to do a lot of them, like the cooking and

12   some of the cleaning."  Tr. 46, 51.  Plaintiff indicated that her husband "can only

13   eat [the] same thing every night.  He eats green peas and organic chicken and

14   potatoes.  That's it."  Tr. 51.  Plaintiff indicated that she "just put[s] [food] in the

15   oven, like 30 minutes it's in the oven" and once the food begins cooking, she

16   "go[es to] sit down" because she "can't stand there and do all that."  Tr. 51-52.

17   Plaintiff explained that she "just put[s] [food] in the oven[ and i]f [she] need[s]

18   help, he[r husband] gets it out for me" and that her husband "can pick up things

19   and do things like that for [her]."  Tr. 52.  Plaintiff indicated that after dinner, she

20   and her husband put their dishes in the dishwasher together, which takes "[j]ust a

21   few minutes because it's just the two of [them]."  Id.  Plaintiff added that with

22   respect to cleaning chores, she lives in "a little house" and she "just do[es] a little

23   bit, you know, here and there when [she] can[,]" like, "a little bit of dusting.  He

24   vacuums.  You know, just wipe down the—whatever, you know, [she] just do[es]

25   what [she] ha[s] to do and when [she] can."  Id.

26   This evidence, which the ALJ did not consider or discuss, demonstrates that

27   Plaintiff's ability to cook and clean is limited and that she receives help performing

28   both tasks from her disabled husband.  Accordingly, because the ALJ did not

13

consider or discuss the above discussed evidence—that Plaintiff can cook and clean in a limited way and with help from her disabled husband—the Court finds that Plaintiff's ability to cook and perform household chores was not a clear and convincing reason for rejecting Plaintiff's symptom statements.

Moreover, with respect to Plaintiff's ability to shop and run errands, the ALJ did not consider evidence in the record that Plaintiff shops because she "ha[s] to" as a result of her husband's disability. Tr. 46. At the administrative hearing, Plaintiff also alluded to her husband helping her with the shopping when he can, but this point is not clear as it appears that the ALJ interrupted Plaintiff when Plaintiff was answering the ALJ's question regarding Plaintiff's ability to shop. Specifically, at the hearing, the ALJ asked: "[sh]hopping?", to which Plaintiff responded "Yeah, I kind of have to. But he'll—you know, when he can do things with me, he'll—", before the ALJ apparently cut in and asked "[a]nd you take care of your own personal needs?" Tr. 46 (sentenced stopped in original). Thus, it appears from Plaintiff's testimony that as a result of her husband's disability, Plaintiff shops for herself and for her husband, but that when her husband is able to, he perhaps provides some type of assistance. Plaintiff's testimony from later in the hearing supports this conclusion.

Specifically, Plaintiff later testified that she has modified her shopping process as a result of her impairments, such as by buying half a gallon of milk now, rather than a full gallon of milk "because [she] doe[s]n't get heavy things" anymore. Tr. 51. Moreover, Plaintiff added that she "do[es]n't try to lift heavy things because [she] know[s] if [she] do[es], it's just going to set off something. So [she] avoid[s]—you know, [her] husband can pick up things for [her]." Tr. 51. Thus, the evidence establishes that Plaintiff shops in a modified way, for lighter items, because she has trouble lifting heavier items and that Plaintiff's husband helps Plaintiff shop by picking things up for her when he can. Moreover, Plaintiff's medical records, which the Court discusses below, indicate the Plaintiff "has

14

chronic neck pain and also pain into both hands and wrists which inhibits lifting activities[,]" which supports Plaintiff's claims that she cannot lift heavy items and has consequently modified her shopping processes to accommodate her limitations. Tr. 492, 495.

Accordingly, because the ALJ did not consider the above discussed evidence—that Plaintiff can shop in a modified fashion, avoiding heavy items and likely with help from her husband when he is able to help—the ALJ's rejection of Plaintiff's statements for shopping and running errands was not a clear and convincing reason for rejecting Plaintiff's symptom statements.

With respect to Plaintiff's ability to walk and climb stairs, the ALJ failed to consider or discuss evidence that Plaintiff had difficulty and limitations with both activities.  Specifically, the ALJ did not consider or discuss Plaintiff's testimony that Plaintiff sold her house and got a "single story house . . . [with] no stairs[] [to] make it easy[,]" and that Plaintiff can walk "[m]aybe 30 minutes" if she wears her prescribed controlled ankle motion ("CAM") walker boot, but that after thirty minutes of walking, Plaintiff has to "go home and put [her] foot up[,]" and that Plaintiff "do[es]n't wear shoes in [her] house at all."  Tr. 39, 50.  Plaintiff added that she "can only wear like tennis shoes, and everything else hurts [her] feet."  Tr. 50.

Plaintiff's medical records appear to corroborate Plaintiff's testimony. Specifically, Dr. Julie M. Chatigny, Doctor of Podiatric Medicine ("DPM")—who reportedly treated Plaintiff since 2015 and whose opinion the ALJ rejected, in part, because Plaintiff "did not require the use of an assistive device for ambulation"— noted that Plaintiff required "assistive devices for ambulation" that included a "CAM walker or surgical shoe orthotics . . . to increase stability and decrease pain" and to "aid in both walking and standing."  Tr. 23-24, 757-58 (capitalization normalized).  Additionally, Dr. Arthur D. Schwartz, M.D., noted that Plaintiff has "[p]robable moderate [degenerative joint disease ("DJD")] of both knees"; zero

15

degrees of extension, pain on flexion, and mild crepitation bilaterally in Plaintiff's knees; and "severely painful knees when she uses stairs, crouches[,] or squats." Tr. 668-70. Dr. Schwartz added that Plaintiff has "[b]ilateral foot problems with cavus feet and multiple toe problems, largely corrected by she still has some hammering of the toes." Tr. 669. Additionally, Dr. Donald. A. Ramberg, M.D., observed Plaintiff to have an antalgic gait when she walked, which indicates a potential problem walking. Tr. 492. Finally, Plaintiff's records indicate that Plaintiff had custom orthotics made to assist with her foot impairments, that her foot impairments resulted in injections and surgery, and that Plaintiff's foot pain was, at times, "too painful to wear regular athletic shoes" and that Plaintiff reportedly "ha[d] been wearing slippers a majority of the time." See Tr. 584-97.

The Court finds that this evidence supports greater limitations in Plaintiff's ability to walk and climb stairs than the ALJ acknowledged. Because the ALJ failed to consider this evidence, the Court finds that the ALJ's rejection of Plaintiff's statements due to Plaintiff's ability to walk and climb stairs was not a clear and convincing reason for rejecting Plaintiff's symptom statements.

Second, the ALJ erred by rejecting objective medical evidence that supports Plaintiff's symptom statements without providing valid reasons for doing so.

The Social Security Administration evaluates medical evidence "according to the rules pertaining to the relevant category of evidence." 20 C.F.R. § 404.153(a). The categories of evidence are: (1) objective medical evidence; (2) medical opinions; (3) other medical evidence; (4) evidence from non-medical sources; and (5) evidence from a prior medical finding. Id.

"Objective medical evidence" includes "medical signs, laboratory findings, or both, as defined in § 404.1502(f)." Id. at § 404.1513(a)(1). By contrast, a "medical opinion" is:

16

a statement from a medical source about what [a claimant] can still do despite [their] impairment(s) and whether [they] have one or more impairment-related limitations or restrictions in the following abilities:

(i) [An] ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

(ii) [An] ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

(iii) [An] ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(iv) [An] ability to adapt to environmental conditions, such as temperature extremes or fumes.

For example, with respect to Plaintiff's ability to drive, Dr. Ramberg, indicated that Plaintiff "has had for a number of years[,] pain in the low lumbar are[a] that goes to the buttocks at times[,] . . . is worse with sitting . . . and [that] driving aggravates the problem." Tr. 492, 495 (emphasis added). Dr. Ramberg included this notation in an examination report where he noted that he "reviewed the MRIs from 2012 and 2016" and observed that Plaintiff's "L3-4 disc is now collapsed[,]" but opined that "surgical fusion is not highly recommended and would now have to be from L3 to the sacrum." Tr. 492. Dr. Ramberg also assessed, in pertinent part, congenital spondylolisthesis of the lumbosacral region, antalgic gait, "pain with motion" and zero-degree extension of the lumbar spine, hyperactive knee reflex, and diminished ankle reflex. Id. Finally, Dr. Ramberg

17

1    noted that Plaintiff used lidocaine patches and was prescribed tramadol, a narcotic-
2    like pain medication, to treat her pain symptoms.  Tr. 491, 494.

3          Although the ALJ observed these treatment records later in the decision
4    when analyzing Plaintiff's medical records, and not when rejecting Plaintiff's
5    symptoms, the ALJ gave these records, and all medical records contained at Tr.
6    236-65, 484-547, 737-41, only "some weight, to the extent these records document
7    treatment and monitoring of [Plaintiff's] chronic conditions, but not to the extent
8    of establishing a disabling degree of severity."  Tr. 22.  The ALJ, however,
9    provided no explanation for rejecting the nearly 100 pages of Plaintiff's treatment
10   records discussed above, which included Dr. Ramberg's notations at Tr. 492, 495
11   that driving aggravates Plaintiff's symptoms.  Instead, after briefly summarizing
12   Plaintiff's medical records contained at Tr. 236-65, 484-547, 737-41, the ALJ
13   concluded her discussion of the evidence by stating: "[t]herefore, treatment
14   records at Exhibits 1 F, 7 F, and 21 F are given some weight."  Tr. 23.

15         Although "it is the ALJ's role to determine credibility and to resolve the
16   conflict[,]" in conflicting medical evidence, Allen v. Heckler, 749 F.2d 577, 579
17   (9th Cir. 1984) (citation omitted), here, the ALJ did not discuss conflicting
18   evidence that driving does not, or would not, aggravate Plaintiff's symptoms.  As
19   such, the ALJ's rejection of the medical evidence that Plaintiff's driving aggravates
20   Plaintiff's symptoms, without explanation, was not a clear and convincing reason to
21   reject Plaintiff's symptom statements.  See Garrison, 759 F.3d at 1012 ("The ALJ
22   must do more than state conclusions.  [Sh]e must set forth his own interpretations
23   and explain why they, rather than the doctor's, are correct."); see also id. at 1012-
24   13 ("[A]n ALJ errs when [s]he rejects a medical opinion or assigns it little weight
25   while doing nothing more than ignoring it, asserting without explanation that
26   another medical opinion is more persuasive, or criticizing it with boilerplate
27   language that fails to offer a substantive basis for his conclusion." (citing Nguyen v.
28   Chater, 100 F.3d 1462, 1464 (9th Cir. 1996)).

1    Moreover, the ALJ selectively relied on only some evidence cited by Dr.
2    Ramberg, while ignoring other evidence cited by Dr. Ramberg, including Plaintiff's
3    antalgic gait, "pain with motion" and zero-degree extension of Plaintiff's lumbar
4    spine, hyperactive knee reflex, diminished ankle reflex, and Plaintiff's use of
5    lidocaine patches and tramadol to treat her pain symptoms.  Tr. 491-92, 494.  Thus,
6    in addition to erroneously failing to explain why Dr. Ramberg's records and the rest
7    of the medical records contained at Tr. 236-65, 484-547, 737-41 were due only
8    some weight, the ALJ also erred in rejecting Dr. Ramberg's records by citing only
9    some of Dr. Ramberg's findings, while ignoring others.  Holohan, 246 F.3d at 1207-
10   08.

11   Similarly, with respect to Plaintiff's ability to work part-time as a
12   bookkeeper, Dr. Ramberg indicated that Plaintiff "continues to have pain in the
13   cervical, both arms, and the back and legs.  This is aggravated by sitting and
14   working at the computer."  Tr. 486, 489 (emphasis added).  Dr. Ramberg added
15   that "Plaintiff continues with cervical and lumbar radiculopathy.  Her job activities
16   are compromised by the symptomology and the disease.  She needs to restrict her
17   activities.  Surgical treatment may be needed in the future, but will probably not
18   affect her work status."  Tr. 487, 490 (emphasis added).  In support of these
19   findings, Dr. Ramberg assessed Plaintiff as having acquired spondylolistheses,
20   cervical spondylosis with myelopathy, and observed that Plaintiff was using
21   lidocaine patches and tramadol to treat her pain symptoms.  Tr. 487-91.

22   As discussed above, however, the ALJ erred by rejecting these records by
23   failing to adequately explain why they were due less weight and by selectively
24   relying on only some of Dr. Ramberg's findings while ignoring others.  As such,
25   Plaintiff's ability to work part-time as a bookkeeper was not a clear and convincing
26   reason for rejecting Plaintiff's symptom statements.

27   Finally, Plaintiff's ability to perform the above discussed ADLs in the limited
28   way Plaintiff performs them does not appear to indicate a "sufficient capacity to

perform focused and substantial activities similar to the capacity required to perform many job functions" as the ALJ found.  Tr. 20; see Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) ("Only if the level of activity were inconsistent with [c]laimant's claimed limitations would these activities have any bearing on [c]laimant's credibility" and "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."); see also Molina, 674 F.3d at 1112-13 ("a claimant need not vegetate in a dark room in order to be eligible for benefits") (citation and internal quotation marks omitted).  Further, the Ninth Circuit "'has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from h[is] credibility as to h[is] overall disability.'"  Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001)).  It is only when a "claimant is able to spend a substantial part of h[er] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, [that] a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain."  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).

For example, the ALJ found that Plaintiff's part-time work as a bookkeeper, "indicate[d] sufficient capacity to perform focused and substantial activities similar to the capacity required to perform many job functions" and, consequently, was "generally inconsistent with disability."  Tr. 20.  Plaintiff, however, testified that she works "[m]aybe five, six" hours total "throughout the week" and that the "longest stint [she has] do[ne] at one time" is "maybe three hours if [she] had to" and that after doing so, she lays down or does "[w]hatever it takes" to alleviate her symptoms including putting "those sticky pad things on [her body] and ice, heat, whatever [she] need[s]."  Tr. 52-53.  Plaintiff added that as a result of "permanent nerve damage in both hands" she can only use a keyboard or a mouse for "[m]aybe an hour."  Tr. 47-78.

It is unclear how Plaintiff's stated ability to work in such a limited basis indicates "the capacity required to perform many job functions" as the ALJ found for a "substantial part of [Plaintiff's] day." <u>Fair</u>, 885 F.2d at 603. Indeed, the ALJ found in the decision that Plaintiff's part-time "work as a self-employed bookkeeper working about 5-6 hours a week, . . . is not considered [SGA]" and "did not rise to the level of [SGA]." Tr. 17-18.

Moreover, it is unclear how Plaintiff's ability to perform the ADLs in the limited ways described above, or Plaintiff's ability to bathe and dress herself, translate to an ability to spend a substantial part of her day engaged in pursuits involving the performance of physical functions that are transferable to a work setting. <u>Fair</u>, 885 F.2d at 603.

Accordingly, Plaintiff's ADLs were not a clear and convincing reason to reject Plaintiff's symptom statements. On remand, the ALJ shall explain how Plaintiff's ability to perform ADLs with the above discussed limitations "indicate[s] sufficient capacity to perform focused and substantial activities similar to the capacity required to perform many job functions" as the ALJ found, Tr. 20, or translate to an ability to "spend a substantial part of h[er] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting," <u>see</u> <u>Fair</u>, 885 F.2d at 603.

b.   *Inconsistencies Between Plaintiff's Statements And The Record*

The ALJ listed four inconsistencies between Plaintiff's statements and the record as cause for rejecting Plaintiff's symptom statements. The Court finds, however, that none of the four purported inconsistencies were clear and convincing reasons to reject Plaintiff's symptom statements.

With respect to the first purported inconsistency noted by the ALJ—that while Plaintiff "testified that she underwent 4 surgeries to each foot and recently underwent left foot surgery in March 2018, she [also] reported to the orthopedic

21

[CE] that she had undergone 5 surgeries to the right foot and 2 surgeries to the left foot" and "if her testimony were accurate, she would have undergone 2 more surgeries to the left foot between April 2017 and the hearings on September 2, 2018, and 1 less surgery to the right foot"—the Court finds that this was not a clear and convincing reason to reject Plaintiff's symptom statements for three reasons. Tr. 20.

First, there is no indication that Plaintiff was the source of the information cited by the CE that Plaintiff had undergone 5 surgeries to the right foot and 2 surgeries to the left foot.  Rather, a close inspection of the CE's report from April 23, 2017, reveals that the CE stated in the "past medical history" section of the report that Plaintiff "has had a tonsillectomy.  She has had seven foot surgeries, two on the right and five on the left for multiple hammertoes and bunions.  She is gravida 0 and has a tubal ligation."  Tr. 668 (capitalization normalized).  Thus, because it is not clear that Plaintiff was the source of the number of foot surgeries cited by the CE, the inconsistency between the number of foot surgeries cited by the CE and the number of foot surgeries Plaintiff reported she had is not a clear and convincing reason to reject Plaintiff's statements.

Second, the record indicates that Plaintiff had more foot surgeries before 1997, the starting date range Plaintiff testified to at the hearing.  Specifically, Plaintiff testified at the September 2018 administrative hearing that since 1997, she has had four surgeries on each foot.  See Tr. 48.  The record indicates, however, that Plaintiff had a foot surgery before 1997.  Plaintiff's records indicate that Plaintiff had foot surgery as early as 1989.  See Tr. 485, 489, 491, 494.  Moreover, the record indicates that Plaintiff had foot surgery in March 2018, eleven months after the CE's April 2017 report was issued.  Thus, the record provides two potential explanations for discrepancies between the number of foot surgeries Plaintiff reported she had at the hearing and the number of surgeries cited by the CE: (1) Plaintiff reported foot surgeries dating back to only 1997 at the hearing,

whereas Plaintiff began having foot surgery as early as 1989.  Thus, if the CE had reviewed Plaintiff's records that spanned back to 1989, he could have been reporting additional surgeries that Plaintiff had not referenced at the hearing that dated back to only 1997; and (2) Plaintiff had an additional foot surgery eleven months after the CE's report, which would explain why the CE had underreported at least one surgery.

Third, to the extent Plaintiff's medical records, rather than Plaintiff, were the source of the information cited by the CE, it is possible that the CE did not have all of Plaintiff's records available for review at the time of the examination because Plaintiff indicated her doctors told her "they no longer have [her] records as it has been too many years" since she has seen them.  Tr. 195.  Thus, some of Plaintiff's records may not have been available for the CE to review and report on. As such, the inconsistency between the number of foot surgeries Plaintiff reported at the hearing and the number of foot surgeries the CE reported Plaintiff had was not a clear and convincing reason to reject Plaintiff's symptoms for this additional reason.

On remand, the ALJ shall specifically consider discuss the above discussed evidence.  Moreover, the ALJ shall explain how this discrepancy is material to Plaintiff's claim, when Plaintiff's amended disability onset date is October 28, 2014, and: (1) some of Plaintiff's surgeries occurred as early as 1989 and, thus appear to be of little relevance to Plaintiff's instant claim; and (2) Plaintiff had multiple surgeries during the relevant time period, and, notably, was even still wearing a foot brace at the September 2018 hearing following her most recent March 2018 foot surgery.  See Tr. 485, 489, 491, 494 (surgeries reported in 1989 and 2005); Tr. 572 (foot surgeries noted in March 2016 and "June-September 2016); Tr. 584, 586 (medical records noting "4 foot surgeries 1998-2004"); Tr. 485, 587, 590 (medical records from 2015 observing Plaintiff's "history of multiple surgeries and resultant hammertoe contractures with bowstringing of extensor

23

tendons"); 594-98 (surgical chart notes from March 2016 left foot surgery) Tr.
599-603 (operative reports from March 2016 left foot surgery);  Tr. 48-49 (Plaintiff
was reportedly wearing a brace on her left foot at the hearing following a March
2018 foot surgery to repair a 2016 "reconstructive surgery" she had because her
"toes wo[uld]n't bend at all").

Accordingly, the ALJ's reliance on the inconsistency between the number of
surgeries noted in the CE's report and the number of surgeries Plaintiff stated she
had at the hearing was not a clear and convincing reason to reject Plaintiff's
symptom statements.

With respect to the second inconsistency noted by the ALJ—that "[w]hile
[Plaintiff] complained of significant knee pain to the orthopedic CE at [Tr. 667-
72] . . ., [Plaintiff] consistently denied difficulty walking or climbing stairs to the
orthopedic surgeon, Dr. Ramberg at [Tr. 489, 494]"—this too was not a clear and
convincing reason to reject Plaintiff's symptom statements because the ALJ's
finding selectively relies on only some evidence, while ignoring the evidence
discussed above indicating that Plaintiff had greater difficulty walking and climbing
stairs than the ALJ observed.  Tr. 20; see infra at 15-16 (citing Tr. 23-24, 39, 50,
492, 668-70, 757-58); Holohan, 246 F.3d at 1207-08.

With respect to the third inconsistency noted by the ALJ—that "[w]hile
[Plaintiff] is not currently engaged in [SGA], her regular and consistent part-time
work activities over a protracted period of time are some evidence tending to show
her ability to engage in [SGA]"—this was not a clear and convincing reason to
reject Plaintiff's symptom statements because, as discussed above, the ALJ erred
by failing to recognize the limited manner in which Plaintiff worked part-time as a
bookkeeper.  Tr. 20; see infra at 19-20; Holohan, 246 F.3d at 1207-08; Fair, 885
F.2d at 603.  On remand, the ALJ shall explain how Plaintiff's ability to work part-
time as a bookkeeper in the limited manner described above "tend[s] to show
[Plaintiff's] ability to engage in [SGA,]" especially when the ALJ also found that

Plaintiff's part-time work as a bookkeeper "working about 5-6 hours a week," in the full capacity described by the ALJ was "not considered [SGA]" and "did not rise to the level of [SGA.]"  Tr. 17-18, 20.

With respect to the ALJ's fourth inconsistency noted by the ALJ—that Plaintiff's "tax returns at [Tr. 222-27] reflect substantial business deductions and appreciation, which appear inconsistent with [Plaintiff's] allegation she is unable to work—this was not a clear and convincing reason to reject Plaintiff's statements regarding her ability to work for two reasons.

First, Plaintiff's tax records show only deductions and appreciation from 2003-2005.  See Tr. 222-27 (Plaintiff's tax records include only: (1) an earning summary from 1967 through 2008, which shows only Plaintiff's "[t]axed Social Security [e]arnings" and Plaintiff's "taxed Medicare [e]arnings"; and (2) three Schedule C profit or loss tax forms from 2003-2005, with only the latter discussing Plaintiff's business deductions and appreciation).  It is unclear how a subset of Plaintiff's tax records from nine to twelve years before her alleged onset date in 2003-2005 refute Plaintiff's claims of disability in 2014-2018.  On remand, the ALJ shall specifically explain this theory further.

Second, even assuming Plaintiff's tax documents were from the relevant time period, and not stale proof of Plaintiff's business dealings from a bygone decade, it is unclear how a claimant's ability to deduct and appreciate things—rather than Plaintiff's ability to earn and generate profits—refute Plaintiff's allegations of disability.  See Fair, 885 F.2d at 603.  On remand, the ALJ shall explain this theory as well.

Accordingly, Plaintiff's tax documents were not a clear and convincing reason to reject Plaintiff's statements.

### c.    Lack Of Stronger Medication

With respect to Plaintiff's medications, the ALJ observed that Plaintiff "only takes Advil during the day and uses a lidocaine patch at night so she is able to sleep.

She uses ice and heat and sits and rests as needed throughout the day." Tr. 19. The ALJ also observed that observed that Plaintiff "reported taking over-the-counter Advil during the day and then using a lidocaine patch at night, despite complaints of 'constant' widespread body pain from 'head to toe.'" Tr. 20-21. The ALJ rejected Plaintiff's symptom statements after explaining that "[if] [Plaintiff's] pain w[as] as severe as alleged, one would expect [Plaintiff] to take stronger prescribed pain medication instead of over-the-counter medication and a patch." Tr. 21.

The ALJ's rejection of Plaintiff's symptom statements due to Plaintiff's lack of taking stronger medication fails for two reasons.

First, the record indicates that Plaintiff took stronger and more medications than the ALJ observed. See Holohan, 246 F.3d at 1207-08. For example, the ALJ failed to consider evidence that Plaintiff took, among other medications, Tramadol for her pain and Gabapentin for her seizures. See Tr. 43, 177, 218, 484-85, 488-91, 667. Moreover, the record reveals that Plaintiff did not use "**a** lidocaine patch at night" to sleep; instead, Plaintiff used two to three lidocaine patches at night, and Plaintiff testified that three lidocaine patches was the maximum number of patches she could use at one time. Tr. 19, 21, 43 (emphasis added). Moreover, Plaintiff received multiple injections throughout the record to treat pain, which the ALJ failed to acknowledge. See Tr. 181-82, 183, 500, 562, 586-87.

Thus, the ALJ's rejection of Plaintiff's symptom statements for not taking a "stronger prescribed pain medication instead of over-the-counter medication and a patch" was not supported by substantial evidence because the record reveals that Plaintiff used prescribed narcotic-like pain medication, as well as multiple—and sometimes even the maximum number of allowed—lidocaine patches.

Second, to the extent Plaintiff used over-the-counter medication rather than prescription medication to treat her symptoms, Plaintiff provided a valid reason for doing so—her prescription medication caused adverse side effects. See Carmickle

v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008) ("[A]lthough a conservative course of treatment can undermine allegations of debilitating pain, such fact is not a proper basis for rejecting the claimant's credibility where the claimant has a good reason for not seeking more aggressive treatment[,]" such as "not tak[ing] . . . medication because of adverse side effects." Id. (internal citation omitted)).  Specifically, Plaintiff testified that she cannot take her prescription medication and perform work tasks due to the side effects the medication causes. Tr. 43-44.  Moreover, Plaintiff's medical records support Plaintiff's allegations of adverse side effects.  For example, Plaintiff's doctors indicated that Plaintiff's prescription medications cause dizziness and drowsiness and affects Plaintiff's ability to work.  Tr. 487, 754.

Accordingly, Plaintiff's lack of taking stronger medication to treat her pain was not supported by substantial evidence in the record and was, therefore, not a clear and convincing reason for rejecting Plaintiff's symptom statements.  Holohan, 246 F.3d at 1207-08; Carmickle, 533 F.3d at 1162.

### d.    Noncompliance With Medical Recommendations

The ALJ listed three instances of noncompliance with medical advice as cause for rejecting Plaintiff's symptom statements.  See Tr. 21.  The Court finds, however, that none of the three purported instances of noncompliance were clear and convincing reasons to reject Plaintiff's symptom statements.

With respect to the first instance of noncompliance, the ALJ noted that "at [Tr. 257] [Plaintiff] refused to undergo lumbar surgery despite a diagnosis of severe lumbar stenosis, although she agreed reluctantly to consult with Dr. Ramberg." Id. The ALJ added that Plaintiff "also refused surgery as to cervical stenosis and she was reluctant to accept her diagnosis." Id.

Here, the ALJ's first instance of noncompliance was not a clear and convincing reason to reject Plaintiff's symptom statements because the record indicates that Plaintiff had good reasons for her reluctance to accept the severe

27

diagnosis and surgery that was recommended to her—within two weeks of the severe diagnosis and surgery recommendation, other doctors diagnosed less severe problems and did not recommend surgery.  <u>Carmickle</u>, 533 F.3d at 1162.

Specifically, the ALJ correctly observed that Plaintiff was "reluctant" to accept her February 2, 2016, diagnosis of severe lumbar stenosis and the resulting recommendation that she undergo lumbar surgery.  <u>See</u> Tr. 257.  However, the ALJ did not consider or discuss when making this finding that one week earlier, on January 25, 2016, Plaintiff was diagnosed by another doctor with only "moderate to severe left and moderate foraminal stenosis . . . at L5-S1" and "at L3-L4[,] . . . moderate left foraminal stenosis."  Tr. 541.  Moreover, although Plaintiff was "reluctant" to consult with Dr. Ramberg as the ALJ correctly observes, Plaintiff nevertheless did so and received a second opinion from Dr. Ramberg on February 16, 2016, that surgery would not be helpful.  Tr. 257, 484-95.  Specifically, Dr. Ramberg noted on February 16, 2016, that Plaintiff's "L3-4 disc is now collapsed.  As [Plaintiff] does not have much in the way [o]f radicular symptoms and the slippage is not increased, surgical fusion is not highly recommended and would have to be from L3 to the sacrum."  Tr. 492, 495.

Moreover, in July 2016, Dr. Ramberg again indicated the surgery was not needed at that time.  Specifically, Dr. Ramberg indicated that Plaintiff "continues [to suffer] with cervical and lumbar radiculopathy" and that Plaintiff's "job activities are compromised by the symptomology of the disease."  Tr. 487.  Dr. Ramberg added that Plaintiff "needs to restrict her activities" and that "[s]urgical treatment may be needed in the future but will probably not affect [Plaintiff's] work status."  Tr. 487, 490.

Accordingly, because there was a good reason for not accepting the severe diagnosis and resulting surgery recommendation—other doctors provided different diagnoses and recommendations—Plaintiff's reluctance to accept a diagnosis and

1    refusal to accept a surgical recommendation was not a clear and convincing reason

2    to reject Plaintiff's symptom statements.

3            With respect to the ALJ's second instance of noncompliance, the ALJ noted

4    that "[a]lthough [Plaintiff] was advised to undergo physical therapy . . . based on a

5    history of improvement with physical therapy, physical therapy progress notes at

6    [Tr. 762-74] indicate no documented attendance in physical therapy after 2013."

7    Tr. 21.  This finding is not supported by substantial evidence in the record.

8    Plaintiff's records reveal that following 2013 when the ALJ found Plaintiff no

9    longer received physical therapy, Plaintiff indeed saw a physical therapist at least

10   ten times beginning on February 24, 2014, for treatment sessions that lasted fifty

11   minutes and included ultrasounds and manual therapy.  See Tr. 766-69, 771-74.

12   Accordingly, Plaintiff's lack of physical therapy after 2013 was not a valid reason to

13   reject Plaintiff's symptom statements.  See Holohan, 246 F.3d at 1207-08.

14           Finally, the ALJ added that Plaintiff "was advised to undergo further

15   injections based on her history of improvement with injections [but] the record fails

16   to reflect compliance or follow-up with this advice."  Tr. 21.  As discussed above,

17   Plaintiff received multiple injections throughout the record to treat pain, which the

18   ALJ failed to acknowledge.  See Tr. 181-82, 183, 500, 562, 586-87.  Thus, Plaintiff's

19   lack of injections was not a valid reason to reject Plaintiff's statements.  See

20   Holohan, 246 F.3d at 1207-08.

21           On remand, the ALJ shall consider and discuss the aforementioned evidence

22   when reassessing Plaintiff's symptom statements.

23                          e.      Limited And Conservative Treatment

24           With respect to the ALJ's rejection of Plaintiff's statements because

25   "[t]reating sources have generally responded with limited and conservative

26   treatment which [Plaintiff] apparently agreed with by failing to undergo surgery[,]"

27   this was not a clear and convincing reason to reject Plaintiff's statements.  Tr. 21.

28   / / /

                                                29

The ALJ's finding is not supported by substantial evidence because, as discussed above, Plaintiff's treatment was more extensive than the ALJ acknowledged. See Holohan, 246 F.3d at 1207-08. Specifically, Plaintiff took prescription medications, saw physical therapists, and received injections beyond what the ALJ acknowledged. Moreover, Plaintiff did not appear to "apparently agree[]" with "conservative treatment" recommendations "by failing to undergo surgery[,]" as the ALJ states. Tr. 21. Rather, as discussed above, Plaintiff had a good reason for rejecting surgery; she received a contradicting diagnosis and a recommendation against surgery within two weeks of the diagnosis and surgical recommendation she rejected. Moreover, Dr. Ramberg, the doctor who recommended against surgery, supported his recommendation with objective findings that Plaintiff's "L3-4 disc is now collapsed[,]" and therefore "surgical fusion is not highly recommended [because it] would now have to be from L3 to the sacrum." Tr. 492. Thus, Plaintiff's recommendation against surgery does not appear to be from a lack of symptomology of a finding that her symptoms were not disabling. Rather, the recommendation appears to be a result of Plaintiff's condition deteriorating—her L3-4 disc collapsing—and her surgery needing to be extensive—from her L3 to her sacrum. Id.

Additionally, the ALJ failed to consider evidence that Plaintiff cannot take some medications that would help ameliorate her symptoms because of adverse side effects those medications would cause when taken in conjunction with Plaintiff's other prescription medications, which the ALJ also did not consider or discuss. For example, Plaintiff indicated that she cannot take medication to treat her vasovagal because that medication interferes with her other prescription medications. Tr. 50. The ALJ's failure to consider this evidence is material here because Plaintiff testified that her ability to stand is limited to fifteen minutes as a result of her vasovagal, and that this limitation kicks in even before Plaintiff's foot and knee impairments require her to sit down. Id. Thus, there is evidence on the

30

record that Plaintiff has tried to take a prescription medication to treat her vasovagal, which limits her ability to stand, but that Plaintiff cannot take this medication for a good reason—the adverse side effects the medication has when combined with Plaintiff's other prescription medication that the ALJ did not even acknowledge Plaintiff took.  <u>Holohan</u>, 246 F.3d at 1207-08; <u>Carmickle</u>, 533 F.3d at 1162.

Accordingly, limited and conservative treatment was not a clear and convincing reason to reject Plaintiff's symptom statements.

### f.    ALJ's RFC And Step Four Finding Fail

The RFC is the maximum a claimant can do despite her limitations.  20 C.F.R. §§ 404.1545, 416.945.  In determining the RFC, the ALJ must consider limitations imposed by all of a claimant's impairments, even those that are not severe, and evaluate all of the relevant medical and other evidence, including the claimant's testimony.  SSR 96-8p, available at 1996 WL 374184.  The ALJ is responsible for resolving conflicts in the medical testimony and translating the claimant's impairments into concrete functional limitations in the RFC.  <u>Stubbs-Danielson v. Astrue</u>, 539 F.3d 1169, 1174 (9th Cir. 2008).  Only limitations supported by substantial evidence must be incorporated into the RFC and, by extension, the dispositive hypothetical question posed to the Vocational Expert.  <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1163-65 (9th Cir. 2001).

Here, because none of the reasons that the ALJ provided for rejecting Plaintiff's symptom statements were clear and convincing, the Court finds that the ALJ's rejection of Plaintiff's symptom statements was not supported by substantial evidence in the record.  Moreover, because Plaintiff's statements and the evidence discussed above that supports Plaintiff's statements suggest that Plaintiff has greater limitations than the ALJ accounted for the RFC, the Court finds that the ALJ's RFC and step four findings are not supported by the record because they do not account for all the functional limitations described in Plaintiff's testimony and

1  the medical records.  As such, the Court finds that the ALJ's decision is not
2  supported by substantial evidence in the record.

3  **IV.   CONCLUSION**

4        Because the Commissioner's decision is not supported by substantial
5  evidence, IT IS HEREBY ORDERED that the Commissioner's decision is
6  **REVERSED** and this case is **REMANDED** for further administrative proceedings
7  under sentence four of 42 U.S.C. § 405(g).  <u>See</u> <u>Garrison</u>, 759 F.3d at 1009
8  (holding that under sentence four of 42 U.S.C. § 405(g), "[t]he court shall have
9  power to enter . . . a judgment affirming, modifying, or reversing the decision of the
10  Commissioner . . . , with or without remanding the cause for a rehearing.")
11  (citation and internal quotation marks omitted).

12
13        IT IS SO ORDERED.
14
15  DATED:  <u>8/28/2020</u>
16                             HONORABLE SHASHI H. KEWALRAMANI
17                             United States Magistrate Judge
18
19
20
21
22
23
24
25
26
27
28